UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| RONALD ELLIOT, | ) |
|     Plaintiff, | ) ) ) |
| v. | )    CAUSE NO. 1:05-CV-00007 |
| JO ANNE B. BARNHART, Commissioner of Social Security, | ) ) ) ) |
|     Defendant. | ) ) |

**OPINION AND ORDER**

**I. INTRODUCTION**

Plaintiff Ronald Elliot ("Elliot") seeks judicial review[1] of the final decision of the Defendant Commissioner of Social Security, Jo Anne Barnhart ("Commissioner"), who found that he was not entitled to Supplemental Security Income ("SSI") or Social Security Disability Insurance Benefits ("DIB"). As the reader will soon learn, Elliot's appeal is a success.

In short, the ALJ's decision was not supported by substantial evidence because he failed to properly identify the physical and mental demands of Elliot's past work and then failed to compare them with what Elliot can presently do. Furthermore, the ALJ's credibility determination concerning Elliot's testimony and his decision not to give the opinion of Elliot's treating physician more weight were not supported by substantial evidence. The Commissioner's final decision, therefore, will be REVERSED and REMANDED for rehearing.

---

[1] All parties have consented to the Magistrate Judge. *See* 28 U.S.C. § 636(c).

1

## II. FACTUAL AND PROCEDURAL BACKGROUND[2]

At the time of his hearing on June 12, 2003, before the Administrative Law Judge ("ALJ"), Elliot was fifty-nine years old. (Tr. 16.)  His past relevant work included group leader of a printing plant from 1964 to 1988, department manager of another printing plant from 1988 to 1998, and the owner of a video/pizza store from 1998 until 2003. (Tr. 36, 104.) The vocational expert classified this last position as light and skilled. (Tr. 58.) Elliot alleges that he can no longer continue this work due to fibromyalgia, diabetes, hypertension, psoriasis, poor vision, and hives. (Opening Br. of Pl. in Social Security Appeal 2.) Most of Elliot's physical limitations stem from his fibromyalgia.

Elliot reports that his fibromyalgia first bothered him in 1988, causing him to try pain medications, vibration, heat pads, exercise, and vitamins. (Tr. 87, 95.) Nothing, however, has helped his pain. (Tr. 95.) As a result, in 1998 Elliot took medical retirement from his job and opened his own business, but the pain eventually forced him to cut back on his hours. (Tr. 87.) Furthermore, Elliot's daily activities, such as showering and getting dressed, were restricted, and sometimes he even needed assistance from his wife. (Tr. 117.) Although he could still do light housework, even that activity was restricted due to declining mobility and pain, and he has totally abandoned recreational activities. (Tr. 117.)

The medical records of Elliot's treating physician, Doctor Theresa Tallon ("Dr. Tallon") date back to 1997. In 1997, Dr. Tallon wrote a letter recommending medical retirement based on an "arthritic-related condition," which caused Elliot "excruciating pain" and which was

---

[2] The administrative record in this case is voluminous (248 pages), and the parties' disputes involve only small portions of it. Therefore, in the interest of brevity, this opinion recounts only the portions of the record necessary to the decision.

aggravated by such factors as immobility, "extended periods of time walking on a cement floor," and "any twisting, turning, or lifting." (Tr. 215.) She further noted his condition was only semi-controlled with medication. (Tr. 215.) On March 11, 2002, Dr. Tallon noted that Elliot's fibromyalgia was getting worse. (Tr. 204.) On that same day, Dr. Tallon responded to a request by the Disability Determination Bureau for medical information regarding Elliot's ability to do work-related physical activity. (Tr. 200.) Dr. Tallon reported that although Elliot had been suffering from fibromyagia for the past fourteen years, his symptoms now were affecting his ability to do work. (Tr. 200.)

Dr. Tallon also completed a "Fibromyalgia Residual Functioning Capacity Questionnaire" on June 2, 2003, in which she noted that Elliot met the American College of Rheumatology criteria for fibromyalgia. (Tr. 236.) Her clinical findings recounted multiple tender points, nonrestorative sleep, chronic fatigue, morning stiffness, muscle weakness, breathlessness, anxiety, panic attacks, and depression. (Tr. 236.) Her description of the nature, frequency, and severity of his pain was "continuous from mild to severe." (Tr. 237.) She opined that in an eight hour work day, he could sit for less than two hours and could stand/walk for less than two hours and that he could lift less than ten pounds occasionally, could lift ten pounds rarely, and could never lift more than ten pounds. (Tr. 239.) She also reported that he was impaired in his ability to twist, stoop, bend, crouch, climb, look down, turn his head, and look up. (Tr. 240.)

Doctor Wassim Khawandi ("Dr. Khawandi") saw Elliot for a consultive examination on April 6, 2002. (Tr. 152.) Unlike Dr. Tallon, Dr. Khawandi concluded that Elliot's history and physical examination did *not* support a diagnosis of fibromyalgia, as Elliot did not have

3

tenderness where fibromyalgia classically exists. (Tr. 153.) However, Dr. Khawandi concluded that Elliot has severe restriction in spinal range of motion and that his daily activities, specifically activities involving bending and using the neck, were significantly affected. (Tr. 153.)

Upon the request of the Commissioner, Doctor Lavallo, a state agency physician, reviewed the record on June 6, 2002. (Tr. 159-60.) He concluded that Elliot could occasionally lift twenty pounds and could frequently lift ten pounds and further opined that in an eight hour work day, Elliot could stand and/or walk for about six hours and could also sit for about six hours. (Tr. 160.) In addition, Dr. Lavallo found that Elliot could only occasionally climb ramps and stairs, balance, stoop, kneel, crouch, or crawl, and that he could never climb ladders, ropes, or scaffolds. (Tr. 161.) On December 12, 2002, Doctor Landwehr, another state agency physician, reviewed the record and concurred with Doctor Lavallo. (Tr. 166.)

Doctor Bijal Katarki ("Dr. Katarki") performed a consultative physical examination of Elliot on March 8, 2003, and reported a history of fibromyalgia. (Tr. 185.) Dr. Katarki then concluded that Elliot's daily life activities were not affected, although a more thorough examination was needed. (Tr. 185.) Dr. Katarki also completed a "Medical Source Statement of Ability to do Work-Related Activities," noting no limitations on Elliot's ability to lift, carry, stand, walk, sit, push, or pull. (Tr. 189-90.)

Elliot originally filed for SSI on January 8, 2002, and for DIB on February 8, 2002, alleging a disability onset date of January 15, 2002. (Tr. 15, 78-80, 87.) ALJ Bryan Bernstein conducted a hearing on June 12, 2003, and rendered an unfavorable opinion on May 27, 2004. (Tr. 28.) The Appeals Council denied Elliot's request for review. (Tr. 5-7.) Elliot filed here on

January 19, 2005, seeking review of the Commissioner's decision, and the matter is now fully briefed.

### III. STANDARD OF REVIEW

Section 405(g) of the Social Security Act ("Act") grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

To determine if substantial evidence exists, the Court reviews the entire administrative record but does not re-weigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's. *Id.* Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003). Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision. *Clifford*, 227 F.3d at 869.

### IV. DISCUSSION

*A. Legal Framework*

Under the Act, a plaintiff is entitled to DIB or SSI if he establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or

mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A), 1382c(a)(3)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3); 1382c(a)(3)(D).

In determining whether Elliot is disabled as defined by the Act, the ALJ conducted the familiar five-step analytical process, which required him to consider the following issues in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant is unable to perform his past work; and (5) whether the claimant is incapable of performing work in the national economy.[3] *See* 20 C.F.R. §§ 404.1520, 416.920; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000).

## B. The ALJ's Decision

In a written decision issued on May 27, 2004, the ALJ determined that Elliot was not

---

[3] Before performing steps four and five, the ALJ must determine the claimant's residual functional capacity ("RFC") or what tasks the claimant can do despite his limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. § 404.1520(e).

disabled. (Tr. 12-21.) The ALJ decided in Elliot's favor on steps one and two, finding that Elliot's fibromyalgia is a severe impairment, but also finding that he did not meet a listing at step three. (Tr. 20.) He then ascertained that Elliot's RFC permitted him to perform a full range of light work activity. (Tr. 20.) Based on this RFC, the ALJ determined at step four that Elliot's fibromyalgia did not prevent him from performing his past relevant work as a video/pizza store owner. (Tr. 20.) The ALJ found, therefore, that Elliot was not disabled and thus was not entitled to either SSI or DIB benefits. (Tr. 21.)

In reaching this decision, the ALJ discredited Elliot's accounts of his physical limitations concluding these accounts were "exaggerated and embellished." (Tr. 18.) Furthermore, the ALJ gave neither governing nor great weight to the opinion of Elliot's treating physician, Dr. Tallon, because her opinions were not consistent with Elliot's daily activities and treatment. (Tr. 19.) Instead, the ALJ relied upon the opinion of Dr. Katarki, a consulting examiner, who reported that Elliot's fibromyalgia did not affect his daily activities. (Tr. 19.)

Elliot advances three arguments for reversal: (1) the ALJ committed legal error by failing to make findings of fact about the physical and mental demands of his past relevant work as a video/pizza store owner and by failing to do a function-by-function analysis comparing these demands to Elliot's present capabilities; (2) he improperly discredited Elliot's testimony;[4] and

---

[4] Implicit in this argument is the assertion that the ALJ's RFC determination is incorrect, as Elliot claims that "there is a significant amount of evidence that he cannot sustain light work." (Opening Br. of Pl. 14). Most of this evidence, catalogued in Elliot's opening brief (*See* Opening Br. of Pl. 14) is based on Elliot's own testimony. If, on remand, the ALJ competently finds that Elliot is not credible, then this "significant evidence" would presumably carry little weight in any subsequent RFC determination.

The only other appreciable evidence Elliot offers to support this claim is the employer questionnaires submitted by James Anderson ("Anderson"), who worked with Elliot from 1989 to 1996. (Tr. 131-36.) Anderson reported a noticeable decline in Elliot's work performance over the years, and because he could tell Elliot was in pain, attributed this decline to a physical problem.

While the ALJ's decision "must be based upon consideration of all the relevant evidence," it is not required that the ALJ provide a written evaluation of every piece of evidence. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir.

(3) he improperly evaluated Dr. Tallon's opinion. These arguments will be discussed in turn.

*C. The ALJ failed to make required findings of fact as to the physical and mental demands of Elliot's past relevant work and failed to compare these demands to Elliot's present capabilities*

At step four in the disability determination, the ALJ must decide whether the claimant can perform his past relevant work. When making this decision, the ALJ is required to make findings concerning "the individual's RFC . . . the physical and mental demands of the past job . . . and whether the individual's RFC [] permit[s] a return to [that] job . . . ." Social Security Ruling ("SSR") 82-62.[5] The ALJ's written evaluation must include an adequate rationale to support these factual findings, as "the decision as to whether the claimant retains the functional capacity to perform past work . . . has far-reaching implications and must be developed and explained fully . . . ." SSR 82-62.

The RFC is a determination of the tasks a claimant can do despite his limitations. *See* SSR 82-62. While the RFC can be expressed in terms of exertional categories such as "light," "medium," or "heavy," the ALJ must first make a more detailed function-by-function assessment of the claimant's current physical and mental abilities so that he may later compare these abilities to the demands of the claimant's past work. SSR 96-8p. Such a comparison allows the ALJ to decide whether the claimant can do his past relevant job as he actually performed it. *See* SSR 96-8p.

The ALJ should next determine "the physical and mental demands of the past job." SSR

---

1994). Thus, the ALJ's failure to mention these questionairres in his decision was not error. Furthermore, if on remand the ALJ determines that Elliot is not credible and does not give weight to Dr. Tallon's opinions, then Anderson's report alone is not "substantial evidence."

[5] Social Security Rulings are binding on the Social Security Administration. *Prince v. Sullivan*, 933 F.2d 598, 602 (7th Cir. 1991).

82-62. It is not enough for the ALJ to describe the claimant's job in a "generic way" as being at the "sedentary," "light," "medium," or "heavy" exertional level. *Nolen v. Sullivan*, 939 F.2d 516, 518 (7th Cir. 1991). Instead, the ALJ "must list the specific physical requirements of the previous job," *id*. (citing SSR 82-62), "because not all jobs within each of those [generic] categories require identical exertional demands." *Dodd v. Shalala*, No. 94-1090, 1994 WL 712598, at *2 (7th Cir. Dec. 23, 1994); *see also Smith v. Barnhart*, 388 F.3d 251, 252 (7th Cir. 2004), *Nolen*, 939 F.2d at 518, *Strittmatter v. Schweiker*, 729 F.2d 507, 509 (7th Cir. 1984).

Finally, the ALJ is required to make a "finding of fact that the individual's RFC would permit a return to his or her past job or occupation." SSR 82-62. This step requires the ALJ to compare the physical demands of the claimant's past work with the claimant's present capabilities. It is not satisfactory for the ALJ to baldly state that because both the claimant's past job and his present RFC fit within the same generic category, the claimant can perform his past work. *Nolen*, 939 F.2d at 518. Instead, the ALJ "must list the specific physical requirements of the previous job and assess, in light of the available evidence, the claimant's ability to perform these tasks." *Id.*

Here, the ALJ's truncated findings concerning Elliot's RFC are mere generic offerings :

7. The claimant has the following residual functioning capacity: full range of light work activity.
8. The claimant's past relevant work as store owner did not require the performance of work-related activities precluded by his residual functioning capacity (20 CFR §§ 404.1565 and 416.927).
9. The claimant's medically determinable fibromyalgia does not prevent the claimant from performing his past relevant work.

(Tr. 20.) Moreover, the ALJ's conclusions, haunted by these skeletal findings, yielded a generic RFC definition of "light work," with no discussion concerning Elliot's specific physical

9

limitations. (*See* Tr. 17.) Nor did he evaluate the physical and mental demands of Elliot's past job as a video/pizza store owner, rather he merely concluded that "[t]he claimant's level of daily activities supports a full range of light work which accommodates his past work as it is performed in the national economy." (Tr. 17.) Later, he wrote, "This work is classified as light exertion . . . . [t]herefore, the claimant is able to return to his past relevant work." (Tr. 20.)

The ALJ's simple findings and conclusions are inadequate under both SSR 82-62 and Seventh Circuit case law discussed *supra*. Describing Elliot's past work as a video/pizza store owner as "light exertion" without further explaining the demands of Elliot's past work is an impermissible generic categorization. *See, e.g.*, *Nolen*, 939 F.2d at 518. Furthermore, it is not enough for the ALJ to conclude that simply because Elliot's RFC at the light exertional level roughly equate with his past work as a store owner that Elliot then was able to perform his past relevant work. *Id.* Instead, the ALJ must specifically consider the physical demands of Elliot's past work and then compare these demands to his present capabilities. It is not enough that the ALJ might have conducted this analysis in his head; we must be able to trace it in his decision. *Strittmatter*, 729 F.2d at 509.

*D. The ALJ's determination that Elliot was not credible is not supported by substantial evidence*

Because the ALJ is in the best position to evaluate the credibility of a witness, his determination generally will not be overturned unless it was "patently wrong." *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). If, however, the reasoning behind the ALJ's credibility determination "does not build an accurate and logical bridge between the evidence and the result," *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000), this Court must remand because the ALJ's decision was based on "serious errors in reasoning rather than merely the demeanor of the

witness." *Carrandine v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2000).

Here, the ALJ did not build a logical bridge between the evidence and his decision that Elliot was not credible. The ALJ concluded that Elliot "exaggerated" his limitations about not being able to work, basing this opinion on Elliot's testimony that although he cannot work, he is able to drive his children to school,[6] drive his wife to work, shop in the mall, and carry bags of food home from the store across the street. (Tr. 18.) Elliot convincingly argues that this characterization of his testimony is inaccurate; stated more fully, while he is able to perform some minimal daily activities, he is unable to sustain the level of physical activity required to work eight hours a day, five days a week. (Opening Br. of Pl. 13.)

Indeed, the failure "to consider the difference between engaging in sporadic physical activities and [the claimant's] being able to work eight hours a day five consecutive days a week" can render an ALJ's credibility determination illogical. *Carrandine*, 360 F.3d at 755. A claimant's ability to perform minimal daily activities "does not undermine [his] claim of disabling pain." *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000.); *see also Shramek*, 226 F.3d at 813.  In *Carrandine*, although the claimant reported that when not in significant pain she could drive, shop, and do housework, it did not follow that she could "maintain effort and concentration over the full course of the work week." *Id*. at 755-56. *But see Gibson v. Massanari*, 18 F. App'x 420, 426 (7th Cir. 2001) (acknowledging that "although a claimant's ability to perform minimal daily activities does not establish that the claimant is capable of substantial physical activity," claimant's hunting, occasionally repairing a car, push-mowing the

---

[6] While Elliot responds that the ALJ is incorrect on this point, as he has only one five-year-old child who stays at home, (Opening Br. of Pl. 13) he testified at the hearing that the child is in pre-school (Tr. 54.)

11

lawn, and attending bingo games and meetings three to four nights a week were not minimal activities).

Here, the record indicates that Elliot's daily activities were minimal. Elliot testified he has good and bad days and can drive, shop, and do housework. (Tr. 50, 54-55.) Even when he does these household chores, however, he is slow and sometimes needs assistance. (Tr. 117, 120.) Elliot also reported that he is no longer able to visit friends or do the hobbies he once loved–golfing, hunting, and riding a motorcycle. (Tr. 48, 51,117, 149.) Even though he is able to engage in some daily physical activities, it does not follow that Elliot could sustain them eight hours a day, five days a week. The ALJ, therefore, engaged in faulty logic when he linked Elliot's sporadic ability to do some minimal household chores with Elliot's contention that he could not work and used that as a basis of finding a lack of credibility.

The ALJ further reasoned that Elliot's testimony was not credible because he "exaggerated and embellished his medical record with accounts of episodes of experiences with unsubstantiated limitations." (Tr. 18.) The ALJ supports this reasoning with an episode in which Elliot claimed to have lost consciousness while driving. (Tr. 18.)  Because Elliot neither went to the emergency room nor went to a neurologist for treatment for this loss of consciousness, the ALJ concludes that this "unsupported allegation[]" implies that Elliot "only [told] the worst case of his condition." (Tr. 18.)

Elliot argues that the ALJ engaged in an "ambush credibility determination" contrary to SSR 96-7p because the ALJ should have considered explanations for the lack of treatment for

this episode.[7]  Under SSR 96-7p, when making his credibility determination the ALJ "must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek . . . medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain . . . failure to seek medical treatment." SSR 96-7p. Because nothing appears in the record to explain why Elliot did not seek treatment for this loss of consciousness episode, the ALJ could not infer a lack of credibility simply from this failure to seek treatment.[8]

### E. The ALJ's determination that Dr. Tallon's opinion is entitled to neither governing nor great weight is not supported by substantial evidence

The opinion of a treating physician should be given great weight in disability determinations because of his or her greater familiarity with the claimant's conditions and circumstances. *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000). More specifically, if the ALJ finds that the treating physician's opinion is "well supported by medically acceptable [evidence] and is not inconsistent with the other substantial evidence in [the] record," the ALJ must give it governing weight. 20 C.F.R. § 404.1527(d)(2). However, "a claimant is not entitled to disability benefits simply because her physician states that she is 'disabled' or 'unable to work' because a treating physician may bring biases to an assessment." *Dixon v. Massanari*, 270 F.3d 1171, 1177

---

[7] Elliot later argues in his reply brief that it was legal error for the ALJ to fail to inquire into the reasons why Elliot did not seek treatment for the loss of consciousness episode, citing this Court's decision in *Lovellette v. Barnhart*, No. 1:02-CV-278, 2003 WL 21918642 (N.D. Ind. June 25, 2003). (Reply Br. 2.) However, the legal error in that case resulted not from the ALJ's failure to inquire about non-treatment, but rather from the ALJ using post-hearing evidence regarding the claimant's initial failure to obtain treatment against the claimant in the credibility determination. *Id.*

[8] SSR 96-7p also provides that "[p]ersistant attempts by the individual to obtain relief of pain or other symptoms . . . generally lend support to an individual's allegations of intense and persistent symptoms." SSR 96-7p. Since it appears from the record that this loss of conciousness was a one-time event and not a persistent symptom, this may explain Elliot's failure to seek medical attention. In contrast, however, he persistently sought treatment for his fibromyalgia, upon which most of his disability claim is based.

(7th Cir. 2001). The Commissioner, not a doctor selected by a patient to treat him, decides whether a claimant is disabled. *Id.*; 20 C.F.R. § 404.1527(e)(1).

Here, the ALJ gave neither governing weight nor great weight to the medical opinion of Elliot's treating physician, Dr. Tallon, because "her characterization of the claimant is significantly inconsistent with [Elliot's] testimony and the treatment pattern he follows." (Tr. 19.) The ALJ gave three reasons for finding Dr. Tallon's opinions inconsistent with the record.

One reason the ALJ advances for not giving Dr. Tallon's opinions governing weight is that they are based merely on Elliot's subjective complaints. (Tr. 19.) The ALJ writes, "She is apparently unaware of the [objective] course of the claimant's daily activities that imply a capacity for light work." (Tr. 19.) However, as discussed *supra*, a claimant's ability to perform minimal daily activities "does not undermine [his] claim of disabling pain." *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000.)  Furthermore, there was little else other than Elliot's complaints on which Dr. Tallon could base her opinion. As the Seventh Circuit has noted, the symptoms of fibromyalgia "are entirely subjective. There are no laboratory tests for the presence or severity of fibromyalgia." *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996).

Given the subjective nature of the disease, this Court is troubled by the ALJ's perfunctory rejection of Elliot's subjective complaints and Dr. Tallon's medical findings based on those complaints. Naturally, fibromyalgia patients may exhibit somewhat limited medical signs and findings since the disease must necessarily be evaluated based on subjective testing responses, *see i.d.*; however, that does not mean there are no medical signs or findings supporting Elliot's allegations. For example, SSR 96-4p provides that while subjective symptoms (i.e., complaints of pain and fatigue) alone are insufficient to establish a disability, *see* 20 C.F.R. §§ 404.1528(a),

416.928(a), those subjective complaints can constitute objective "medical signs" (as defined by 20 C.F.R. §§ 404.1528(b), 416.928(b)) when they are manifested by "an anatomical [or] physiological . . . abnormality that can be shown by medically acceptable clinical or diagnostic techniques[.]" SSR 96-4p n.2 (citing 20 C.F.R. §§ 404.1528; 404.1529, 416.928, 416.929).

Here, Dr. Tallon found that Elliot met the American College of Rheumatology's criteria for fibromyalgia through a diagnostic technique that tests eighteen tender-point sites on digital palpation. Indeed, this Court previously determined that when a doctor conducts this test and ultimately determines that a claimant was severely limited in the ability to work, the ALJ cannot discount the doctor's opinion as lacking objective findings  *Liscano v. Barnhart*, 230 F. Supp. 2d 871, 888 (N.D. Ind. 2002).[9] Therefore, the ALJ was not entitled to discount Dr. Tallon's opinion on this basis.

A second reason the ALJ gave for discrediting Dr. Tallon's opinion as "inconsistent" was Dr. Tallon's report indicating that Elliot was working less due to his physical condition, not because his business was failing. (Tr. 19.) Elliot contends that the ALJ's reasoning does not build a logical bridge between the evidence and the conclusion because it was not supported by

---

[9] When an ALJ does not give a claimant's treating doctor's opinion controlling weight, the ALJ must give consideration to the following factors: length of the treatment relationship, nature and extent of the relationship, the amount of relevant evidence the doctor provides to support his opinion, and the consistency of the opinion with the rest of the record. 20 CFR § 404.1527. In light these factors, it is interesting that the ALJ gave great weight to the opinion of Dr. Katarki, who saw Elliot on only one occasion and who admitted in his report that "more thorough examinations are needed to evaluate his complaints" while giving no weight to a doctor who had treated Elliot since 1997. (Tr. 185.)

It is also curious that the ALJ lauded Dr. Katarki's opinion as "consistent with the admissions of activities afforded by the claimant" when Dr. Katarki concluded that Elliot's daily life activities were not affected by his condition. (Tr. 19.) In fact, Dr. Katarki reported that Elliot's activities were so completely unaffected by his fibromyalgia that he could frequently lift 100 pounds or more; he had the unlimited ability stand, walk, sit, push, and pull; and he could frequently balance, kneel, crouch, crawl, and stoop. (Tr. 189-91.) No other medical experts, including consulting examiner Dr. Khawandi and two State Agency medical consultants, offered such seemingly outrageous assessments. It is difficult, therefore, to view Dr. Katarki's opinion as "consistent" with the rest of the record.

15

Elliot's testimony. However, Elliot's testimony does support the ALJ's conclusion, as it suggests that his business was failing both because of his physical condition and because of simple economics. In response to whether the competition from a video store down the street caused his store to close, Elliot testified that "I think it's a combination of factors. I think the decline in hours hurt immensely." (Tr. 58.) Elliot also testified that he didn't hire "some kid" to help with the store because "the business wasn't there" (although he later qualified this by saying that people in a small town like to see the boss when they come in). (Tr. 10.) Based on Elliot's testimony, it was logical for the ALJ to conclude that one of the factors that contributed to the store closing was its downward economic spiral. Thus, there was substantial evidence to support the ALJ's discrediting Dr. Tallon's opinion on this rather minor point.[10]

Finally, the ALJ did not give Dr. Tallon's report governing weight because Elliot discontinued use of one medication (Wellbutrin) prescribed by Dr. Tallon and only intermittently used another (Bextra). (Tr. 19.) This led the ALJ to conclude that Elliot was not as ill as when Dr. Tallon prescribed the medications. (Tr. 19.)  However, the ALJ's conclusions are not an accurate reflection of the record, as they failed to take into account Elliot's concerns with side effects. Elliot testified that the Bextra did not relieve his pain, and while Wellbutirn took the edge off his pain, he weaned himself off of it because he feared side effects. (Tr. 47-49.) Dr. Tallon, consistent with Elliot's testimony, noted that Elliot's condition was only semi-controlled with medication and acknowledged a concern that most of these medications have side effects.

---

[10] If a doctor's medical opinion is supported by substantial evidence, whether it should be given less weight is a subjective determination best left to the ALJ,. The ALJ's reasoning here, however, was somewhat problematic. Dr. Tallon wrote her letter in response to a request from the Disability Determination Bureau for a statement about Elliot's physical ability to do work. (Tr. 200.) Dr. Tallon would naturally be most familiar with whether Elliot closed his store due to his medical condition, not unrelated business matters.

(Tr. 215.) While it is true that neither Elliot nor Dr. Tallon explicitly stated that Elliot experienced side effects, the record provides no other evidence, other than his expressed concern for side effects, for Elliot's discontinuance of the medications. Therefore, without taking into consideration these concerns, the ALJ failed to build a logical bridge between the evidence regarding Elliot's concern for side effects and his unwarranted conclusion that Elliot discontinued the medication because he was not in pain.

## V. CONCLUSION

In sum, the ALJ's decision at step four was not supported by substantial evidence because he failed to make proper findings of fact with respect to the physical and mental demands of Elliot's past work as a video/pizza store owner and because he failed to compare these demands with Elliot's present capabilities to perform this job. Furthermore, the ALJ's credibility determination with respect to Elliot's testimony and his decision not to give Dr. Tallon's opinion governing weight were not supported by substantial evidence. For these reasons, the decision is hereby REVERSED and REMANDED to the Commissioner for further findings consistent with this opinion. SO ORDERED.

Enter for October 4, 2005.

                S/Roger B. Cosbey
                Roger B. Cosbey,
                United States Magistrate Judge